## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| FRANK M. BARNEY, Individually and as Administrator of the Estate of SONCERA KIMBERLY BARNEY, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV420-173 |
| | ) | |
| GREGORY T. PETERS, M.D.; REAL RADIOLOGY, LLC, JOHN DOES 1-5; and JOHN DOES, INC.'S 1-5, | ) ) ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiffs Soncera Kimberly Barney[1] and her husband Frank M.

Barney originally filed this medical malpractice action on June 30, 2020,

in the State Court of Liberty County, Georgia, against Gregory T. Peters,

M.D., Real Radiology, LLC ("Real Radiology"), and numerous individual

and entity John Doe defendants. *See* doc. 1-1 at 2-3; *see also* doc. 64 at 2.

Defendants Peters and Real Radiology removed it to this Court based on

---

[1] Plaintiff Soncera Kimberly Barney died during the pendency of this case, and Frank Barney, as Administrator of the Estate of Soncera Kimberly Barney, was substituted as Plaintiff. *See* doc. 48. Plaintiffs Frank Barney, individually and as Administrator of the Estate of Soncera Kimberly Barney, filed an Amended Complaint adding a wrongful death claim and seeking damages on behalf of the Estate. Doc. 64 at 1.

1

its diversity jurisdiction.  Doc. 1 at 1.  Defendant Peters then moved to dismiss the claims against him pursuant to Federal Rule of Civil Procedure 12(b)(2), arguing that this Court lacks personal jurisdiction over him under the Georgia Long-Arm Statute and the United States Constitution. Doc. 26.[2]  Plaintiff has responded, doc. 68, Peters has replied, doc. 73, and Plaintiff has sur-replied, doc. 77.  The motion is ripe for review.

## I.   BACKGROUND[3]

Peters is a radiologist based in Omaha, Nebraska.  Doc. 26-1 at 1.  In August 2016, he entered into a Professional Services Agreement ("PSA") with Real Radiology ██████████████████████████████ ████████████████████████████████████████████████████

---

[2] Peters incorporated his Motion to Dismiss into his Answer to Plaintiffs' Amended Complaint.  Doc. 66 at 1.

[3] For purposes of this motion, the Court "must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits." *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 255 (11th Cir. 1996).



[4] The Professional Services Agreement has been designated "Confidential" by the Defendants pursuant to a Confidentiality Agreement entered into by the parties, and the parties have represented that it contains confidential and proprietary information pertaining to Peters' employment relationship with Real Radiology, LLC. Doc. 25.  For that reason, the Court permitted it to be filed under seal.  Doc. 53. Therefore, the Court will file a redacted version of this Order on the public docket, with any reference to the contents of the Professional Services Agreement redacted. The Clerk is **DIRECTED** to maintain the unredacted version of this Order in accordance with his standard policies and procedures.  He is further **DIRECTED** to provide an unredacted copy to the parties.

████████████████████████████████████████

████████████████████████████████████████

██████████████████████  ██  ████

Included among Real Radiology's clients are medical facilities located in Georgia.  Doc. 68-1 at 13; doc. 68-3 at 1-2.  Therefore, Real Radiology required Peters to obtain a medical license from the State of Georgia.  Doc. 26-1 at 4.  He complied with that obligation, applying, with the assistance of Real Radiology, for his Georgia license.  Doc. 26-1 at 4-5, *see generally* doc. 68-4.  Although Peters signed a Specific Power of Attorney authorizing Real Radiology to "carry out and execute certain duties" in connection with his application for a Georgia medical license, *see* doc. 68-4 at 14, Peters ultimately signed the application, *see e.g., id.* at 26, and acknowledged that he had read the application and answered all questions in compliance with the application's instructions, *id.* at 28.  When signing the application, Peters affirmatively represented that he intended to practice medicine in Georgia.  *Id.* at 3.  He received his Georgia medical license on June 23, 2017.  *See* doc. 68-9 at 13-14.  Upon receiving his Georgia medical license, Peters began interpreting cases for

Real Radiology's Georgia clients.  *See* doc. 68-1 at 14 (testimony that a list of Peters' Georgia cases begins on June 23, 2017).

At some point before March 26, 2018, Peters obtained privileges from Winn Army Community Hospital ("WACH") on Fort Stewart in Liberty County, Georgia.  Doc. 26-1 at 4 (Peters' affidavit stating that he was required to apply for privileges at WACH); doc. 68-1 at 15 (Real Radiology 30(b)(6) testimony that Peters first reads an image for WACH on March 26, 2018).  Since WACH is located on Fort Stewart, Peters must have been pre-approved before interpreting cases from that facility.  Doc. 68-1 at 7.  According to Real Radiology, Peters would have been made aware that he was approved to read for WACH, at which point he would also know that he could possibly receive a case from that facility.  *Id.* at 7-8.  From March 26, 2018, through September 7, 2018, the date of the conduct complained of in this lawsuit, Peters read, interpreted, and reported on 289 studies which originated from WACH.  *See* doc. 68 at 9-10.[5]  Images from WACH carry with them "the identification that it's

---

[5] In making this representation, Plaintiffs refer to Exhibit 2 to their motion, and acknowledge that the text of that exhibit is "extremely small."  *See* doc. 68 at 9.  The electronic version of Exhibit 2 filed on the Court's docket is not just hard to read, it is illegible.  *See* doc. 68-2.  However, to the extent Peters does not challenge Plaintiffs' summarization of Exhibit 2, *see generally* doc. 73, the Court accepts it as true.

Winn Army Community Hospital in Fort Stewart." Doc. 68-1 at 11; *see also* doc. 68-10 (image at issue in this case, which includes the notation "WINN" twice: once in the top right corner and once directly above the image to be interpreted). Any report that Peters reviewed and approved for a WACH case would have included the facility name. Doc. 68-1 at 9.

WACH is not the only Georgia facility for which Peters interpreted cases. From June 2017, when he was first licensed in Georgia, through October 2020, Peters interpreted 3,115 cases for Georgia facilities. Doc. 68-3 at 3-4. Of those cases, 1,663 originated at WACH. *Id.* (that total comprised of 373 cases in 2018, 869 cases in 2019, and 421 cases in 2020). Real Radiology provides Peters with monthly reporting that lists the facilities for which he interpreted cases that month. Doc. 68-1 at 16. From September 2017 through September 2018, every monthly report provided to Peters included Georgia-based facilities. *See* doc. 68-6. In August 2018, the reporting shows that he interpreted 99 cases from Georgia facilities, and that 75 of those cases originated at WACH. Doc. 68-6 at 3. The next month, September 2018, his reporting shows that he interpreted 65 cases from Georgia facilities, with 26 of those cases

originating at WACH.  *Id.* at 2.  One of those 26 cases is the subject matter of this litigation.

On September 7, 2018, Soncera Kimberly Barney went to the WACH Emergency Medicine Clinic for pain in her right neck and shoulder area.  Doc. 64 at 3.  A CT scan of her neck was ordered and performed that day.  *Id.*  That evening, Peters, while in Nebraska, received an electronic copy of the CT scan through Real Radiology's system, "onePACS."  Doc. 26-1 at 3.  He read the images using equipment provided by Real Radiology.  *Id.*  Peters then prepared a radiology report that indicated "mild right submandibular gland edema and adjacent inflammatory changes may be secondary to local cellulitis or sialadenitis. No abscess."  *Id.* at 3-4; *see also* doc. 64 at 4.  He electronically signed the report and uploaded it to the onePACS platform.  Doc. 26-1 at 3-4.  The report was then transmitted to WACH.  Doc. 64 at 4.  Peters did not communicate directly with Barney[6] or any of her providers at WACH. Doc. 26-1 at 4.  However, Peters would have been available for such communication from Barney's medical providers should they have

---

[6] The Court will refer to Kimberly Soncera Barney as "Barney," and her husband and the current Plaintiff as "Frank Barney."  The two are sometimes referred to jointly as "Plaintiffs."

7

deemed it necessary.  *See* doc. 68-1 at 9.  While it did not happen in Barney's case, Peters was "routinely called by facilities" for which he prepared reports.  Doc. 68-9 at 10.  He does not recall being specifically aware that any of these calls were with Georgia providers.  Doc. 26-1 at 3.

In the early morning hours of September 8, 2018, Barney was "released w/o limitations" from WACH.  Doc. 64 at 4.  In April 2019, Barney again presented to the outpatient clinic at WACH with reported complaints of pain in her right shoulder.  *Id.*  In June 2019, a radiograph revealed a lytic lesion on her right clavicle.  *Id.* at 5.  After further imaging, she was referred to a surgical oncologist.  *Id.* at 4-7.  She was ultimately diagnosed with a metastatic carcinoma tumor in her right shoulder in September 2019.  *Id.* at 7.

Plaintiffs filed this lawsuit alleging that Peters breached the standard of care and was grossly negligent in "failing to properly read, interpret, and report Soncera K. Barney's September 7, 2018 CT of the neck which should have included identification of a lytic lesion abnormality on the right clavicle as well as language to the effect that said lytic lesion required further work-up as it could represent a

cancerous condition." Doc. 64 at 9. Plaintiffs also allege that Peters'
gross negligence is imputed to Real Radiology. *Id.* at 10. Peters has
moved to dismiss Plaintiffs' claims against him, arguing that he is not
subject to the personal jurisdiction of this Court. *See generally* doc. 26.

## II.   ANALYSIS

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may
move to dismiss a claim against it by asserting the defense of lack of
personal jurisdiction. Fed. R. Civ. P. 12(b)(2). "A plaintiff seeking to
establish personal jurisdiction over a nonresident defendant bears the
initial burden of alleging in the complaint sufficient facts to make out a
prima facie case of jurisdiction. [Cite]. When a defendant challenges
personal jurisdiction by submitting affidavit evidence in support of its
position, the burden traditionally shifts back to the plaintiff to produce
evidence supporting jurisdiction." *Louis Vuitton Malletier, S.A. v.
Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (internal quotation marks
and citations omitted). The district court is required to accept facts the
plaintiff puts forth in the complaint as true if they are undisputed by the
defendant's affidavits. *Cable/Home Commc'n Corp. v. Network Prods.,
Inc.*, 902 F.2d 829, 855 (11th Cir. 1990). Further, "[w]here the plaintiff's

complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (quoting *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir.2002)).

"A federal court sitting in diversity may properly exercise jurisdiction over a defendant only if two requirements are met: (1) the state long-arm statute, and (2) the Due Process Clause of the Fourteenth Amendment." *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir. 1999) (citation omitted). The Georgia long-arm statute, O.C.G.A. § 9-10-91, does not grant jurisdiction that is "coextensive with procedural due process," and "imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." *Diamond Crystal*, 593 F.3d at 1259 (citing, inter alia., *Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames, Iowa*, 620 S.E.2d 352 (Ga. 2005)). Therefore, the Court must apply the "specific limitations and requirements of O.C.G.A. § 9-10-91 literally and must engage in a statutory examination that is independent of, and distinct from, the constitutional analysis to

ensure that both, separate prongs of the jurisdictional inquiry are satisfied." *Id.* at 1263. If the long-arm statute's requirements are satisfied, the Court then determines whether the exercise of jurisdiction violates federal due process.

## A.    Georgia Long-Arm Statute

Plaintiffs allege that Peters is subject to the jurisdiction of this Court because he was "transacting business within the State of Georgia" and "committed a tortious injury to Plaintiffs in the State of Georgia caused initially by an act or omission that began outside the State of Georgia (Nebraska) in the course of . . .regularly doing and engaging in business in Georgia, and engaging in a persistent course of conduct within Georgia and in deriving substantial revenue from business in Georgia." Doc. 64 at 2.[7]

---

[7] Plaintiffs also allege in the Amended Complaint that Peters is subject to jurisdiction in this Court as he "committed a tortious act and or omission in the State of Georgia[.]" Doc. 64 at 2. However, they do not make this argument in their response to Peters' Motion to Dismiss. *See generally* docs. 68, 77. They have not produced any evidence supporting jurisdiction under this theory as required by the Eleventh Circuit's burden-shifting framework for personal jurisdiction inquiries. *See Louis Vuitton Malletier, S.A.*, 736 F.3d at 1350; *see also Packard v. Temenos Advisory, Inc.*, 159 F. Supp. 3d 1344, 1356 (S.D. Ga. 2016) ("The plaintiff must substantiate allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint." (internal cites and quotes omitted)).

Relevant to the analysis of this Court's jurisdiction over Peters, Georgia's long-arm statute states that Georgia courts:

> may exercise personal jurisdiction over any nonresident ..., as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he or she were a resident of this state, if in person or through an agent, he or she:
>
> (1) Transacts any business within this state; [or]. . .
>
> (3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state . . . .

O.C.G.A. § 9–10–91(1) & (3).  For a court to have personal jurisdiction over a nonresident defendant, at least one prong of this statute must be satisfied.  *Diamond Crystal Brands, Inc.*, 593 F.3d at 1260.  This Court is required to interpret and apply Georgia's long-arm statute in the same way as would the Georgia Supreme Court.  *Id.* at 1258.

The Court will first address Peters' conduct in Georgia through the lens of § 9–10–91(3).  Plaintiffs allege that Peters' "actions and omissions in completely failing to review, interpret, report, and indicate within [Barney's] CT scan radiology report of September 7, 2018, the existence of a lytic lesion in the right clavicular area along with the notation to the effect that said lytic lesion/abnormality could represent a cancerous

condition and further work-up was recommended, constitutes gross negligence" and that his gross negligence caused a ten month delay in the care and treatment of Barney's progressing, but undiagnosed, right clavicular cancer, and caused her to experience pain and suffering prior to her death.  Doc. 64 at 9-10; *see also id.* at 2.  The Court is satisfied that Plaintiffs adequately allege that Peters committed a tortious injury in Georgia caused by an act or omission outside of Georgia.  Such conduct, however, only confers jurisdiction over Peters if there is enough evidence to suggest that he "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in" Georgia.  O.C.G.A. § 9-10-91(3).

Peters argues that Plaintiffs cannot meet this burden, because "[t]he extent of [his] interaction with the State of Georgia is that he holds a medical license in Georgia and has privileges at one Georgia hospital – WACH."  Doc. 26 at 4; *see also* doc. 73 at 6 (describing Peters' contacts with Georgia as limited to signing "applications that Real Radiology prepared requesting a medical license and one set of hospital privileges in Georgia.").  He argues that any other contact with Georgia is through

Real Radiology, his contract employer, and such contact cannot be imputed to him.  Doc. 73 at 12.  But Peters, through his contractual agreement with Real Radiology, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████  ██  ████  He then affirmatively took steps to become licensed to practice medicine in Georgia.  *See* doc. 68-4 (Georgia Licensure Application).  Even if this licensure was at the request of Real Radiology, ████████████████████

████████████████████████████████████████████████

██████████████████████████  ██  ████████████████

Once Peters obtained his Georgia medical license, he used that license to practice medicine in Georgia, ██████████████████████████

████████████████████████████████████████████████

██  ██████████████████████████████  ████████████████

████████████████████████████████████  ██  ██████████

████████████████████████████████████████████████

14

██████████████████████████████████ ██ ██████████████████  *see also* doc. 68-9

(Peters' testimony that he was "routinely called by facilities" for which he

prepared reports).

Prior to preparing Barney's report, Peters prepared thousands of

radiology reports that were sent to and relied upon by Georgia

practitioners who were rendering care to Georgia patients.  In the month

before Peters interpreted Barney's CT scan from WACH, he interpreted

75 cases from the same hospital.  Doc. 68-6 at 3.  He interpreted 24

additional cases for other Georgia-based entities.  *Id.*  That represents 99

reports, in just one month, that Peters prepared and sent, through Real

Radiology's platform, to Georgia entities where Georgia physicians were

providing care to Georgia patients just like Barney.

Peters explains, via affidavit, that he did not know that the scan he

read on September 7, 2018 was for a patient located in the State of

Georgia when he interpreted that scan.  Doc. 26-1 at 3.  He also avers

that he "do[es] not ever recall being specifically aware of any patient [he

has] treated or any other provider with whom [he has] discussed a patient

being located in or a resident of the State of Georgia."  *Id.*  ██████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████  Real Radiology also made it

clear that, at some point during the process of Peters becoming approved

to read images for WACH, he would have been made aware of that

approval.  Doc. 68-1 at 7-8.

Peters engages in a "persistent course of conduct" in Georgia.  In

his time with Real Radiology, he interpreted thousands of studies and

provided thousands of reports to Georgia-based physicians.   He

intentionally sought out a license to practice medicine in Georgia, and he

was informed by his employer that he would be interpreting scans, not

just in Georgia, but for the exact facility where he ultimately sent his

interpretation of Barney's CT scan.  While he may not have subjectively

appreciated, at the time he prepared the report, that it would be used in

rendering care to a Georgia-based patient at WACH, he intentionally

took steps to gain the necessary approvals to do just that.  Therefore, this

Court may exercise jurisdiction over Peters under O.C.G.A. § 9-10-91(3).

*See Collett v. Olympus Medical Systems Corp.*, 437 F. Supp. 1272, 1278

(M.D. Ga. January 22, 2020) (foreign company had an agreement with a

domestic distributor to sell its products in the United States; therefore,

it is reasonable to infer that the seller sold the products for the purpose of having them distributed in the United States, including Georgia, and jurisdiction pursuant to O.C.G.A. § 9-10-91(3) was appropriate).

Section 9-10-91(1), which allows jurisdiction over a nonresident who "[t]ransacts any business within this state," also authorizes jurisdiction over Peters.  To exercise personal jurisdiction over a nonresident who transacts business within Georgia, the following requirements must be met:

> first, the nonresident must have purposefully done an act or consummated a transaction in Georgia; second, the cause of action must arise from or be connected with such act or transaction; and third, the exercise of jurisdiction by the courts of this state must not offend traditional fairness and substantial justice.

*Gateway Atlanta Apartments, Inc. v. Harris*, 660 S.E.2d 750, 757 (Ga. Ct. App. 2008) (citing *Robertson v. CRI, Inc.*, 601 S.E.2d 163, 163 (Ga. Ct. App. 2004)).

Georgia courts broadly interpret the first prong—a purposeful act or consummation of a transaction in Georgia—as neither requiring the nonresident defendant's physical presence in Georgia nor minimizing the importance of his intangible contacts with this State.  *Packard v. Temenos Advisory, Inc.*, 159 F. Supp. 3d 1344, 1357 (S.D. Ga. 2016) (citing

*Innovative Clinical*, 620 S.E.2d at 355); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 ("[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." (emphasis added)); *Diamond Crystal Brands, Inc.*, Inc., 593 F.3d at 1260 (noting that a defendant need not physically enter Georgia to "transact any business" in the state).

The second prong of this analysis requires the act or transaction discussed in the first prong to give rise to or have some connection to the cause of action. *Packard*, 159 F. Supp. 3d at 1357. Their combination determines whether the nonresident has established minimum contacts with the state. *Gateway Atlanta Apartments, Inc.*, 660 S.E.2d at 757. "The application of (the minimum contacts) rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Aero Toy Store, LLC v. Grieves*, 631 S.E.2d 734, 737 (Ga. Ct. App. 2006).

The third prong, or the "due process" prong, "requires that the nonresident have performed purposeful acts to tie itself to Georgia, and these minimum contacts may not be merely random, fortuitous, or attenuated." *Gateway Atlanta Apartments, Inc.*, 660 S.E.2d at 757 (quotations omitted).  Factors a court may consider when analyzing this prong include "the burden on defendant, the forum state's interest in adjudicating the dispute, plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution to controversies, and the shared interest of the states in furthering substantive social policies." *Aero Toy Store, LLC*, 631 S.E.2d at 737.

Peters purposefully reached into Georgia, through the help of Real Radiology, to gain the right to practice medicine in the state.  *See* doc. 68-4.  He then traded on that medical license by interpreting scans from Georgia facilities on behalf of his contract employer.  *See, e.g.,* doc. 68-6. As a result, he interpreted Barney's scan, sending his report, through Real Radiology's platform, to her physicians at WACH.  The Plaintiffs' claims all arise from Peters practicing medicine in the state, and from Peters sending his radiology reports into the state.  *See* doc. 64 at 9-11.

His contacts with Georgia are not random, fortuitous, or attenuated; they are the very contacts he contemplated, or should have, when he affirmatively represented that he intended to practice medicine in the state, and when he was specifically told that he would be interpreting scans for WACH. *See* doc. 68-4 at 3.

### B.   Due Process

Federal case law requires that a federal court sitting in diversity undertake a Fourteenth Amendment analysis in addition to applying the forum state's long-arm statute. *Posner*, 178 F.3d at 1214. Although Georgia already requires a due process analysis in applying its long-arm statute, *see supra*, these two inquiries are not "one and the same," *Diamond Crystal Brands*, 593 F.3d at 1261–63. Thus, a court must conduct a constitutional analysis independent of the statutory long-arm assessment to determine whether personal jurisdiction over a nonresident defendant is appropriate. *See id.* at 1263.

The Due Process Clause protects an individual's liberty interest in not being subject to binding judgments imposed by foreign sovereigns. *Burger King Corp.*, 471 U.S. at 471–72 (1985). It requires "'that the defendant's conduct and connection with the forum State [be] such that

20

he should reasonably anticipate being haled into court there.'" *Id.* at 474 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).  Thus, exercise of personal jurisdiction comports with federal due process when the nonresident defendant (1) has adequate minimum contacts with the forum state, and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice.  *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 853 (11th Cir. 1988).  "[T]he central concern of the inquiry into personal jurisdiction is the relationship among the defendant, the forum, and the litigation." *Id.* (internal quotes and cites omitted).

Peters' contacts with Georgia—as distinguished from Real Radiology's contacts with Georgia—demonstrate that he has "purposefully directed his activities at residents of the forum, and [this] litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp.*, 471 U.S. at 472-73 (internal cites omitted). ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ ████████████ Georgia is one of those states.  Therefore, he intentionally sought a Georgia medical

21

license.  *See generally* doc. 68-4.  He then cooperated with Real Radiology to become approved to read scans for WACH, located in Georgia.  *See* doc. 68-1 at 7.  He ultimately used both his Georgia license and his WACH approval to transmit his work-product directly to WACH, using a platform designated by his employer.  *See* doc. 26-4 at 3, 68-1 at 8-9. Peters has sufficient minimum contacts with the forum state.  *See, e.g., Urspruch v. Greenblum*, 968 F. Supp. 707, 711 (S.D. Ga. 1996) (finding sufficient minimum contacts where non-resident defendant prepared cytology report which was relied upon by plaintiff's doctors in making their diagnosis); *Sanders v. Ball*, 1999 WL 397921, at *3-4 (E.D. La. June 11, 1999) (finding pathologist had sufficient minimum contacts with Louisiana where pathologist and his lab in Alabama routinely and willingly accept samples from Louisiana and made a diagnosis and returned it to Louisiana "knowing its extreme significance and knowing it would be the basis of [the patient]'s further treatment").

Finally, the exercise of jurisdiction over Peters does not offend the traditional notions of fair play and substantial justice.  *Delong Equip. Co.*, 840 F.2d at 853.  In making this determination, the Court "looks to the burden on the defendant, the forum State's interest in adjudicating

the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies." *Diamond Crystal Brands, Inc.*, 593 F.3d at 1274 (internal quotes and cites omitted). Peters has not presented the requisite "compelling case" that exercising jurisdiction would be unconstitutionally unfair. *Id.*; *see also Urspruch*, 968 F. Supp. at 711 (finding that Georgia has a compelling interest in protecting its residents from receiving negligent medical care). As the Middle District of Georgia observed in *Collett*, "Constitutional due process protection may be broad, but it is not unlimited." 437 F. Supp. 3d at 1282. Peters purposefully availed himself of the privileges of practicing medicine in this state; he is now subject to suit here.

## III. CONCLUSION

This Court may exercise personal jurisdiction over Defendant Peters under the Georgia Long-Arm Statute, O.C.G.A. § 9-10-91, and the

exercise of that jurisdiction does not offend his due process.  Therefore,

his Motion to Dismiss is **DENIED**.  Doc. 26.

     **SO ORDERED**, this 12th day of November, 2021.

_____
CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA